# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE** | : | |
| | : | **Chapter 13** |
| **STEVEN ROSENBLUM** | : | |
| | : | |
| **DEBTOR** | : | |
| _____ | : | **Case No. 14-19756-AMC** |

Ashely M. Chan, United States Bankruptcy Judge

# <u>OPINION</u>

# TABLE OF CONTENTS

I.  Introduction ............................................................................................................. 1

II.  Facts and Procedural History ................................................................................ 1

III.  Discussion ............................................................................................................ 4

    A.  Although This Court Has Original and Concurrent Jurisdiction to Resolve
Actions to Avoid Fraudulent Transfers, the State Court Also Has Concurrent
Jurisdiction to Resolve Such Actions .............................................................. 5

    B.  The Trustee Has Exclusive Standing to File Avoidance Actions Under
§ 544(b) ........................................................................................................... 9

        1.  The Trustee Has Exclusive Standing to File Avoidance Actions Under
§ 544(b) to Avoid Fraudulent Transfers ............................................... 10

        2.  Kerwin Qualifies as a Present Creditor Under PUFTA §§ 5104–05 ..... 12

        3.  Kerwin May Be Considered a Creditor Even Though He Failed to File
a Proof of Claim or an Adversary Complaint in the Bankruptcy Case ... 13

    C.  Derivative Standing May Be Granted to Creditors Under Appropriate
Circumstances in Chapter 13 Bankruptcies ................................................... 16

        1.  Review of Third Circuit Analysis in Cybergenics II ............................. 16

        2.  Application of Cybergenics to Chapter 13 Proceedings ........................ 20

    D.  Plaintiffs Are Entitled to Derivative Standing to Pursue the State Litigation ... 21

        1.  The Fraudulent Transfer Claims Are Colorable .................................... 22

        2.  The Second Requirement Is Satisfied When the Trustee Declines to
Pursue an Avoidance Action Due to a Lack of Financial Resources and
Such Avoidance Action Would Benefit the Estate ................................ 33

        3.  Plaintiffs' Failure to Seek Prior Court Approval Is Not Fatal ............... 35

        4.  Kerwin's Failure to Petition the Trustee Is Not Fatal ........................... 37

    E.  It Is Appropriate to Hold the Bankruptcy Proceedings in Abeyance Until the
State Litigation Is Resolved .......................................................................... 39

IV.  Conclusion ......................................................................................................... 42

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE                                    :
                                         :          Chapter 13
STEVEN ROSENBLUM                         :
                                         :
                    DEBTOR               :
                                         :          Case No. 14-19756-AMC
_____  :

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

### I.    INTRODUCTION

This opinion addresses, *inter alia*, whether the Court may use its equitable power under

§ 105(a) to confer derivative standing upon a creditor in a Chapter 13 proceeding to avoid a

fraudulent transfer action under § 544(b) which would directly benefit the estate.  After

reviewing the purpose and form of Chapter 13 proceedings, the Court has concluded that, when a

Chapter 13 trustee declines to file an avoidance action which will directly benefit the estate

because the Chapter 13 trustee has insufficient resources to pursue such action, the Court may

use its equitable power under § 105(a) to confer derivative standing upon a creditor to file such

action under § 544(b).

### II.    FACTS AND PROCEDURAL HISTORY

Ryan Kerwin ("Kerwin") and Xtreme Caged Combat ("XCC") filed a trademark

infringement action against Steven Rosenblum ("Debtor"), Ofa Donaldson ("Donaldson"), and

Extreme Cage Combat Fitness ("ECC Fitness" and collectively with the Debtor and Donaldson,

"Trademark Defendants") in the United States District Court for the Eastern District of

Pennsylvania ("District Court") on July 12, 2012 ("Trademark Litigation").  Debtor's Answer to

Mot. by Creditors, Ryan Kerwin and Xtreme Caged Combat, to "Hold Debtor's Bankruptcy

Proceedings in Abeyance" Ex. A ("Compl.") ¶ 7.[1]  On August 13, 2014, a judgment

("Judgment") was entered in favor of Kerwin and XCC against the Trademark Defendants in the

amount of $76,800.  *Id.* ¶ 12.

On October 21, 2014, the District Court entered an order ("Discovery Order") compelling

the Debtor to respond to Kerwin's post-judgment interrogatories and document requests

regarding the Debtor's assets and finances.  Mot. to Dismiss Steven Rosenblum's Bankruptcy

Filing and Set Aside Automatic Stay Pursuant to 11 U.S.C. §1307(c) & 11 U.S.C. §362(d)(1)

("Mot. to Dismiss") ¶¶ 5–6.  When the Debtor failed to respond to the Discovery Order, the

District Court entered an order requiring the Debtor to show cause why the Debtor should not be

sanctioned for failing to comply with the Discovery Order.  *Id.* ¶¶ 7–8.  On December 11, 2014,

the eve of the show cause hearing, the Debtor filed a voluntary bankruptcy petition under

Chapter 13 of the Code.  *Id.* ¶ 9.

On December 15, 2014, Kerwin filed a Motion to Dismiss the Debtor's bankruptcy case

based upon the Debtor's alleged bad faith.  *Id.* ¶¶ 13–16.  The Motion to Dismiss also sought

relief from the automatic stay.  *Id.*

On January 8, 2015, the Debtor filed a proposed Chapter 13 Plan ("Plan") which offered

to pay a total of $34,666.80 to the Trustee, allocated as follows: $25,000 payable to the IRS;

$2,300 payable to the Pennsylvania Department of Revenue; $2,400 payable to the City of

Philadelphia for real estate taxes; and $1,500 payable to the Debtor's attorneys.  Chapter 13 Plan,

1–2, Jan. 8, 2015.  The balance of any funds remaining after such Plan distributions would be

paid *pro rata* to the Debtor's other creditors, including Kerwin.  *Id.*

---

[1] ECC Fitness is a gym purportedly owned by the Debtor, and Donaldson is purportedly a former employee
of ECC Fitness.  Compl. ¶¶ 10–11.

Kerwin and XCC failed to file a formal proof of claim in connection with their Judgment by the June 2, 2015 bar date deadline. Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors, & Deadlines 1. However, Kerwin is *pro se* and, as evidenced in his Motion to Dismiss, has asserted his right to collect the Judgment since the inception of this case. Mot. to Dismiss ¶¶ 13–16. Kerwin also has indicated his intent to file an adversary complaint under § 523(c) of the Code in order to obtain a determination that the Judgment is nondischargeable as a willful and malicious injury pursuant to § 523(a)(6) of the Code. Order and Mem. Op. of Sept. 11, 2015 ("Extension Order") at 2. The Court has extended the deadline for Kerwin to file such an action until ten days after resolution of the Motion to Dismiss. *Id.* at 4.

On June 1, 2015, during a telephonic scheduling conference in connection with the Motion to Dismiss, Kerwin disclosed that, on May 29, 2015, he and XCC ("Plaintiffs") had unilaterally filed a fraudulent transfer complaint ("Complaint") in the Bucks County Court of Common Pleas ("State Litigation") against third parties who allegedly received certain property from the Debtor prior to the Debtor's bankruptcy filing.[2]  Specifically, Plaintiffs sued Michelle Zarro, who is allegedly a close friend of the Debtor ("Zarro"), and Allan Rosenblum, who is the Debtor's father ("Rosenblum" and collectively with Zarro, "Defendants"). Compl. ¶¶ 3–6, 21, 31.

The Complaint alleges that the Debtor transferred 100% of his ownership interest in a Torresdale gym to Zarro, and 50% of his ownership interest in a Levittown gym to Rosenblum, without receiving any consideration in exchange for those transfers. *Id.* ¶¶ 28, 37, 40. Accordingly, the Complaint seeks to set aside the transfers to Zarro and Rosenblum under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. Stat. and Cons. Stat. Ann.

---

[2] Kerwin is not represented by counsel in either this bankruptcy proceeding or the State Litigation. XCC is currently represented by the same attorney, A. Jordan Rushie, in both proceedings.

§§ 5101–5110 (West 2015). *See* Compl. ¶¶ 1, 38–50 (raising claims under PUFTA §§ 5104–05, hereinafter referred to as the "PUFTA Claims").[3]

The Court then requested briefing on Plaintiffs' right to file the State Litigation. In response, Plaintiffs filed a Motion to Hold Debtor's Bankruptcy Proceedings in Abeyance ("Abeyance Motion") pending the conclusion of the State Litigation. Mem. of Law in Supp. of Mot. to Hold Debtor's Bankruptcy Proceedings in Abeyance ("Creditors' Abeyance Br.") 5–6. The Debtor subsequently objected to the Abeyance Motion. At a hearing held on the Abeyance Motion on July 20, 2015, the Court *sua sponte* raised the question of Plaintiffs' standing to pursue the fraudulent transfer claims in light of the Trustee's exclusive standing to pursue fraudulent transfers under § 544(b) of the Code.[4] Accordingly, the Court requested that the parties submit supplemental briefing to address whether Plaintiffs were entitled to derivative standing to pursue the State Litigation. Both parties filed briefs on the derivative standing issue and this Court held a hearing on that issue on September 15, 2015. At the hearing, Kerwin represented, *inter alia*, that any proceeds received in connection with the State Litigation would be turned over to the Chapter 13 Trustee ("Trustee"). Hearing Tr. 16:12–24, Sept. 15, 2015.

## III.    DISCUSSION

The parties raised certain jurisdictional issues in their briefs related to the proper forum for the adjudication of the PUFTA Claims. As discussed in full below, the Court has concluded that, although this Court has original and concurrent jurisdiction to hear an avoidance action under § 544(b) to address the PUFTA Claims, the state court also has concurrent jurisdiction to

---

[3] The facts set forth in the Complaint will be addressed in greater detail in Section III(D)(i) of this Opinion.

[4] The Court raised the question of Kerwin's standing *sua sponte* because standing is a "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102 (1998). "[Q]uestions of standing, if they exist, must be considered *sua sponte*." *In re Gronczewski*, 444 B.R. 526, 532 n.4 (Bankr. E.D. Pa. 2011) (quoting *In re Total Containment, Inc.*, Bankr. No. 04-13144bf, Adv. No. 05-0145, 2008 WL 682455, at *9 n.11 (Bankr. E.D. Pa. Mar. 5, 2008)).

resolve such claims.  The Court has further concluded that the Trustee has exclusive standing to file avoidance actions under § 544(b).

With respect to the derivative standing issue, the Third Circuit has not yet resolved whether a bankruptcy court may, under its equitable power, confer derivative standing on a creditor in a Chapter 13 proceeding to pursue an avoidance action under § 544(b).  As discussed below, after reviewing the purpose and form of Chapter 13 proceedings, the Court has concluded that it has the ability under its equitable power to grant derivative standing to a creditor in a Chapter 13 proceeding to file an avoidance action under § 544(b), and that there are appropriate grounds in this case to justify retroactively granting derivative standing to Plaintiffs to pursue the State Litigation under § 544(b).  Finally, the Court has determined that the Abeyance Motion should be granted.

> **A.    Although This Court Has Original and Concurrent Jurisdiction to Resolve Actions to Avoid Fraudulent Transfers, the State Court Also Has Concurrent Jurisdiction to Resolve Such Actions**

Kerwin argues that this Court does not have subject matter jurisdiction to hear state fraudulent transfer claims because such claims are not "within the public rights exception and are thus beyond the authority of bankruptcy courts to adjudicate."  Creditors' Abeyance Br. 4 (quoting *Feldman v. ABN AMRO Mortg. Grp. Inc.*, 515 B.R. 443, 448–49 (E.D. Pa. 2014)).  Therefore, he argues that the State Litigation must proceed in the Bucks County Court of Common Pleas.  *Id.*

The Debtor argues that this Court has "sole and exclusive jurisdiction to issue a final order" on matters "related" to the bankruptcy and that the fraudulent transfer claims alleged in the State Litigation are "related" to the Debtor's bankruptcy proceeding.  Mem. of Law in Supp. of Debtor's Answer to Mot. by Creditors, Ryan Kerwin and Xtreme Caged Combat, to "Hold Debtor's Bankruptcy Proceedings in Abeyance" ("Debtor's Abeyance Br.") 2.  Accordingly, the

Debtor asserts that the "complaint belongs solely in the United States Bankruptcy Court."

Debtor's Mem. of Law Contra Creditors'/Movants' Mot. to Hold Bankruptcy Proceeding in

Abeyance ("Debtor's Derivative Standing Br.") 6–7.[5]

Both parties are wrong. A bankruptcy court has original and concurrent, but not

exclusive, jurisdiction to resolve actions under § 544(b) to avoid state fraudulent transfer claims

related to a debtor's bankruptcy proceeding. However, the state court also has concurrent

jurisdiction to resolve such claims. If the Trustee had filed an adversary proceeding in this case

asserting the PUFTA Claims under § 544(b), the Court would have had subject matter

jurisdiction to adjudicate those claims, but would not have had the ability to enter final orders in

connection with them unless both parties consented.[6]

By way of background, district courts "have original and exclusive jurisdiction of all

cases under title 11." 28 U.S.C. § 1334(a). As used in § 1334(a), the phrase "cases under title

---

[5] The Debtor also appears to argue that avoidance actions under § 544(b) constitute property of the estate pursuant to § 541(a)(1) and that commencement of the State Litigation was a violation of the automatic stay. However, the majority view on this issue is that "property transferred by the debtor pre-petition becomes estate property only *after* it has been recovered by the bankruptcy trustee." *In re Gronczewski*, 444 B.R. 526, 531 n.3 (Bankr. E.D. Pa. 2011) (emphasis added) (quoting *In re Bankr. Estate of Midland Euro Exchange, Inc.*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006)); *cf. In re Cybergenics Corp.*, 226 F.3d 237, 246 n.16 (3d Cir. 2000) (first citing *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989); then citing 5 Collier on Bankruptcy ¶ 541.14 n.1 (Lawrence P. King ed., 1999)) (describing as "hardly . . . universally accepted" the view that the debtor retains an "equitable interest" in fraudulently transferred property). The United States Bankruptcy Court for the Western District of Pennsylvania has held that "[t]ransferred property subject to recovery in an avoidance action is not property of the estate until it is actually recovered." *In re Wagner*, 353 B.R. 106, 113 (Bankr. W.D. Pa 2006). Following this precedent, this Court concludes that the filing of the State Litigation therefore does not implicate the automatic stay under § 362.

[6] Although the action to adjudicate the PUFTA Claims is not before this Court, the Court recognizes that Congress separated bankruptcy matters into "core" and "non-core" proceedings based upon the distinction drawn by the Supreme Court between "private rights," which may only be adjudicated by Article III courts, and "public rights," which may be removed from the jurisdiction of Article III courts. *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2171 (2014) (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69–71 (1982)). If the action to adjudicate the PUFTA Claims had been filed in this Court, this Court would not have had the ability to enter final orders in connection with such claims absent the consent of all parties. The adjudication of such claims would constitute a non-core proceeding because the PUFTA Claims are not "irreversibly intertwined" with the resolution of claims against the estate. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Feldman v. ABN AMRO Mortg. Group Inc.*, 515 B.R. 443, 446–47, 449 (E.D. Pa. 2014).

11" simply refers to the bankruptcy petition itself. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 n. 38 (3d Cir. 2004); *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991).

District courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). A proceeding is one "arising under title 11" if the claims asserted in the matter are based upon a right created or determined by title 11. *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d at 267; *In re Montague Pipeline Techs. Corp.*, 209 B.R. 295, 299 (Bankr. E.D.N.Y. 1997). A proceeding "arising in" a case under title 11 includes certain administrative matters "that are found only in bankruptcy and which do not exist outside of a bankruptcy case." *In re Montague Pipeline Techs. Corp.*, 209 B.R. at 299; *see also* 28 U.S.C. § 157(b)(2).

Proceedings "related to" a case under title 11 are typically described as proceedings that are otherwise related to a case under title 11 whose outcome could conceivably have an effect on the administration of the bankruptcy estate. *See In re The Guild & Gallery Plus, Inc.*, 72 F.3d 1171, 1181 (3d Cir. 1996) (stating that an action is related to a bankruptcy case "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankrupt estate"). A proceeding that is "related to" a bankruptcy case "need not necessarily be against the debtor or against the debtor's property." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (interpreting predecessor to § 1334(b)).

Furthermore, each district court "may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). "In this district, the district court has adopted a Standing Order, pursuant to which cases meeting the criteria set forth

in 28 U.S.C. § 157(a) are referred to the bankruptcy court." *In re Glunk*, Bankr. No. 05-31656-ELF, Adv. No. 06-373, 2006 WL 6659552, at *2 (Bankr. E.D. Pa. Aug. 18, 2006) (citing *In re Lassina*, 261 B.R. 614 (Bankr. E.D. Pa. 2001)).

Thus, this Court has original and exclusive jurisdiction over the Debtor's bankruptcy case and original but not exclusive jurisdiction over any or all civil proceedings arising under title 11 or arising in or related to the Debtor's case. Given the broad definition of "related to," it is clear that an action to address the PUFTA Claims under § 544(b) is related to the Debtor's bankruptcy proceeding because the outcome of such litigation could conceivably have an effect on the administration of the Debtor's bankruptcy estate. If successful, the fraudulently transferred assets (or the value thereof) would be added to the Debtor's estate and become available for distribution to the Debtor's creditors. Therefore, this Court has original but not exclusive jurisdiction to hear an action to adjudicate the PUFTA Claims under § 544(b).

Moreover, the Third Circuit has recognized that, "[a]s is evident from the language of 28 U.S.C. § 1334(c)(1), the district courts may, but are not required to, proceed concurrently with a state court on some aspects of a bankruptcy claim." *In re Mystic Tank Lines Corp.*, 544 F.3d 524, 528 (3d Cir. 2008). As the Third Circuit explained *Mystic Tank*:

> the only aspect of the bankruptcy proceeding over which the district courts and their bankruptcy units have exclusive jurisdiction is "the bankruptcy petition itself." *See In re Wood*, 825 F.2d 90, 92 (5th Cir.1987). In other matters arising in or related to title 11 cases, unless the Code provides otherwise, state courts have concurrent jurisdiction....

*Id.* at 529 (quoting *In re Brady Mun. Gas Corp.*, 936 F.2d 212, 218 (5th Cir. 1991)).

Accordingly, the Bucks County Court of Common Pleas shares concurrent jurisdiction with this Court over the adjudication of the PUFTA Claims under § 544(b). *See, e.g., In re Kaufman & Roberts, Inc.*, 188 B.R. 309, 314 (Bankr. S.D. Fla. 1995) (in connection with a pre-petition state court action which alleged, *inter alia*, state fraudulent transfer claims, the

- 8 -

bankruptcy court held that, "[b]ecause of this Court's concurrent jurisdiction with the state court, the Trustee may intervene in the state court action"); *In re CitX Corp.*, 302 B.R. 144, 161 n.10 (Bankr. E.D. Pa. 2003) (citing *Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1573 (Fed. Cir. 1995)) (observing that, under 28 U.S.C. § 1334(b), "bankruptcy courts do not have exclusive jurisdiction over adversary proceedings, and such matters may be heard in a non-bankruptcy forum"); *Hopkins v. Plant Insulation Co.*, 342 B.R. 703, 712–14 (D. Del. 2006) (in deciding whether to abstain from exercising jurisdiction over a state court proceeding filed by a Chapter 11 debtor under § 544 where the complaint was "based entirely on state law claims" including the recovery of fraudulent transfers, the district court recognized that "this Court's jurisdiction over the Section 544 claims is concurrent with the state court").

The State Litigation therefore may proceed in the Bucks County Court of Common Pleas provided that this Court determines that it has the power to grant creditors derivative standing in Chapter 13 proceedings, Plaintiffs demonstrate that they are entitled to retroactive derivative standing to pursue the State Litigation, and the Complaint is amended to clarify that Plaintiffs have been granted derivative standing under § 544 to pursue the PUFTA Claims on behalf of the Debtor's estate.

**B.    The Trustee Has Exclusive Standing to File Avoidance Actions Under § 544(b)**

Plaintiffs argue that the Trustee has exclusive standing under § 544(b) in only two situations: (1) "when a creditor attempts to exercise [the Trustee's] Chapter 5 avoidance powers . . . . in the bankruptcy court"; and (2) when the Trustee exercises his avoidance powers and the property becomes a part of the estate under § 541(a)(3) of the Code. Mem. of Law in Supp. of Creditors' Claim that They Have Derivative Standing to Pursue the Fraudulent Transfers Action

Against Michelle Zarro and Allan Rosenblum in the State Ct. ("Creditors' Derivative Standing

Br.") 2–4.

On the other hand, the Debtor argues that Plaintiffs lack standing to raise the PUFTA

Claims because the Trustee has exclusive standing under § 544 of the Bankruptcy Code to raise

such claims and has chosen not to do so.  Debtor's Derivative Standing Br. 5.

1.    The Trustee Has Exclusive Standing to File Avoidance Actions Under
§ 544(b) to Avoid Fraudulent Transfers

The trustee has exclusive standing to file avoidance actions under § 544(b) to avoid

fraudulent transfers under both federal and state law.  By its plain language, § 544(b) does not

restrict a trustee's standing to claims under federal law:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an
> interest of the debtor in property or any obligation incurred by the debtor that is
> voidable *under applicable law* by a creditor holding an unsecured claim that is
> allowable under section 502 of this title or that is not allowable only under section
> 502(e) of this title.

11 U.S.C. § 544(b)(1) (emphasis added).  It is well settled that § 544(b) "provides that after the

commencement of a bankruptcy case, only the bankruptcy trustee may bring an action to . . . set

aside a pre-petition fraudulent transfer made by the bankruptcy debtor." *In re Gronczewski*, 444

B.R. at 533*; see also In re Total Containment, Inc.*, 335 B.R. 589, 612 (Bankr. E.D. Pa. 2005) (a

trustee may "avoid a transfer that would be avoidable under state law by a creditor holding an

unsecured claim" under § 544(b)).

The Third Circuit has explicitly held that the phrase "the trustee may" at the beginning of

§ 544(b) cannot be read to mean "the trustee and other parties in interest may." *Official Comm.*

*of Unsecured Creditors of Cybergenics Corp.* ex rel. *Cybergenics Corp. v. Chinery*, 330 F.3d

548, 559 (3d Cir. 2003) [hereinafter *Cybergenics II*].  In that case, the court characterized the

trustee as "a gatekeeper [who] prevents independent avoidance actions by creditors that might

- 10 -

prejudice the estate and rival creditors." *Id.* at 568; *see also In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983) (section 544(b) "allows the bankruptcy trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance acts for the benefit of all creditors, not just those who win a race to judgment"); *In re Polichuk*, 506 B.R. 405, 431 (Bankr. E.D. Pa. 2014) (stating that a trustee's § 544(b) powers allow him to "assemble a bankruptcy estate for the benefit of all creditors").

To permit a creditor to raise a fraudulent transfer claim after a bankruptcy case has commenced would "permit [the creditor] to effectively circumvent the bankruptcy code's policy and the protections to be afforded by it to the [debtor's] other creditors." *Constitution Bank v. DiMarco*, 155 B.R. 913, 918 (E.D. Pa. 1993) (citing *In re Pointer*, 952 F.2d 82, 87–88 (5th Cir. 1992)). Thus, during the period that a trustee retains exclusive standing, creditors may not raise fraudulent transfer claims, even in state court, until after the trustee's standing expires.[7] *See In re Gronczewski*, 444 B.R. at 534 (citing *Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993)) (stating that the creditors' "right to prosecute the fraudulent transfer claims raised in the State Court Action ultimately depends on . . . the decisions [the trustee] makes within the [deadline to file]"); *In re Integrated Agri, Inc.*, 313 B.R. 419, 429 (Bankr. C.D. Ill. 2004) (citing *Casey Nat'l Bank v. Roan*, 668 N.E.2d 608 (Ill. App. Ct. 1996)) (stating that the trustee's standing expired and "creditors with standing under state law may now commence an original UFTA suit in an appropriate non-bankruptcy forum"); *In re Daniele Laundries, Inc.*, 40 B.R. 404, 408 (Bankr. S.D.N.Y. 1984) (stating that the trustee's fraudulent transfer action "supersedes [the creditor's] state court action, so that [the creditor] lacks standing to pursue its case").

---

[7] The deadline for a trustee to commence an action under § 544 of the Code is the later of (A) two years after the order for relief is entered; or (B) one year after a trustee is appointed or elected under §§ 702, 1104, 1163, 1202, or 1302 of the Code, if appointed or elected within two years of the order for relief.  11 U.S.C. § 546(a)(1).

Based upon the foregoing, the Trustee has exclusive standing to file avoidance actions under § 544(b) to avoid fraudulent transfers under both federal and state law, and Plaintiffs did not have standing to file the State Litigation because the Trustee's exclusive standing to file such claims had not yet expired.

2.    Kerwin Qualifies as a Present Creditor Under PUFTA §§ 5104–05

The Debtor asserts that the Trustee can only avoid a transfer under § 544(b) "that is voidable under applicable law" and that, under PUFTA, fraudulent transfers may not be avoided unless there exists either a "present creditor" or "future creditor" at the time of the alleged fraudulent transfers.  Debtor's Derivative Standing Br. 11.  He then argues that Plaintiffs do not qualify as a "present creditor" under PUFTA § 5105, or a "future creditor" under § 5104, at the time of the alleged transfers.  *Id.* (Plaintiffs do not qualify as a "present creditor" because their Judgment "arose after the alleged transfers" and do not qualify as a "future creditor" because they "had no claim or reasonable expectation of a claim").

In order to qualify as a "present creditor" under PUFTA, a person must hold a "claim [which] arose before the transfer was made." PUFTA § 5105.  PUFTA defines a claim as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.* § 5101(b).  Here, Plaintiffs have alleged that the Debtor "intended to hide all of his financial assets during the pendency of the trademark infringement suit." Compl. ¶ 11.  According to the allegations in the Complaint, the Debtor fraudulently transferred his assets <u>after</u> Plaintiffs filed their trademark infringement suit against the Debtor. Compl. ¶¶ 7–9, 19–20, 29–30.  As a result, Plaintiffs were present creditors of the Debtor for the purpose of PUFTA § 5105 because they held contingent claims against the Debtor at the time of the alleged fraudulent transfers.

- 12 -

In addition, a fraudulent transfer claim may be filed under PUFTA § 5104 as long as

there exists *either* a present creditor or a future creditor. PUFTA § 5104. Based upon the

discussion above, Plaintiffs clearly qualify as a present creditor for PUFTA § 5104. Because

Plaintiffs qualify as a present creditor under PUFTA, an avoidance action could have been filed

by the Trustee to avoid the PUFTA Claims under § 544(b).

The Debtor also argues that he had to be named as a defendant in any PUFTA action.

However, § 550(a) explicitly states that

> to the extent that a transfer is avoided under section 544 . . . the trustee may recover,
> for the benefit of the estate, the property transferred, or . . . the value of such
> property, from— (1) the initial transferee of such transfer or the entity for whose
> benefit such transfer was made; or (2) any immediate or mediate transferee of such
> initial transferee.

Thus, avoidance actions under § 544 could have been filed against the initial, immediate, or

mediate transferee by the Trustee without the involvement of the Debtor.[8] Here, the State

Litigation was filed against Zarro and Rosenblum who both are purported to be initial transferees

of the alleged fraudulent transfers, and, had the Trustee filed the State Litigation under § 544, the

Debtor would not have needed to be named as a defendant.

 3. Kerwin May Be Considered a Creditor Even Though He Failed to File a
 Proof of Claim or an Adversary Complaint in the Bankruptcy Case

The Debtor appears to argue that the Trustee could not have filed an avoidance action

under § 544 because neither of the Plaintiffs have filed a proof of claim in this proceeding.

Under § 544(b), a trustee may only avoid a transfer of the debtor's property that is voidable

under applicable law "by a creditor holding an unsecured claim that is allowable under section

---

[8] Moreover, "[i]t is well-recognized that recovery from the transferee is one of the potential avenues for
relief by a plaintiff pursuing a fraudulent transfer case." *In re Lockwood Auto Grp., Inc.*, 428 B.R. 629, 640 (Bankr.
W.D. Pa. 2010) (citing *United States v. Rocky Mountain Holdings, Inc.*, Civ. A. No. 08-3381, 2009 WL 564437, at
*3 (E.D. Pa. Mar. 4, 2009)); *see also* PUFTA § 5108(b)(1) (authorizing judgments against "the first transferee of the
asset" and other persons).

502." Here, Plaintiffs were required to file a proof of claim by June 2, 2015 in order to be an

allowed creditor under § 502, but failed to do so.[9] Debtor's Derivative Standing Br. 7. Although

§ 544 only references an "allowable" claim and does not require that such claim actually be

allowed, the Court has independently determined that Kerwin's Motion to Dismiss constitutes an

informal proof of claim.

By way of background, if a formal proof of claim is not timely filed, § 502(b)(9) dictates

that the claim cannot be allowed. *In re Strohl*, No. BR 5-12-BK-05929-JJT, 2014 WL 202648,

at *1 (Bankr. M.D. Pa. Jan. 16, 2014). However, the Third Circuit has allowed "informal

proof[s] of claim" in the absence of filed proofs of claim under certain circumstances. *Id.* (citing

*In re Am. Classic Voyages Co.*, 405 F.3d 127 (3d Cir. 2005)).

Whether a document constitutes an informal proof of claim is determined by a five-part

test. *In re Am. Classic Voyages Co.*, 405 F.3d at 130–31. The document must (1) be in writing;

(2) contain a demand by the creditor on the estate; (3) express the creditor's intent to hold the

debtor liable for the debt; (4) be filed with the bankruptcy court; and (5) if the document satisfies

the first four requirements, it must "be equitable to treat the document as a proof of claim" under

the circumstances of the case. *Id.* In order to constitute a demand against the estate, the demand

may not merely state that a claim exists; rather, it must "put the debtor and/or the court on notice

as to 'the existence, nature and amount of the claim (if ascertainable).'" *Id.* at 132 (quoting *In re

Charter Co.*, 876 F.2d 861, 863 (11th Cir. 1989)). Various documents may qualify as informal

proofs of claim, such as "motions for relief from an automatic stay, letters notifying the trustee of

---

[9] The Debtor also points out that Kerwin failed to file an adversary complaint by the May 3, 2015 deadline,
but does not clarify how Kerwin's failure to do so impacts either the Trustee's exclusive standing to file avoidance
actions under § 544(b) or the derivative standing analysis. Debtor's Derivative Standing Br. 7. Regardless, the
deadline for Kerwin to file an adversary complaint under § 523(c) has not yet expired. Extension Order 4.

a debt of the estate, and complaints against a chapter 7 discharge together with an objection to a chapter 13 plan." *In re Charter Co.*, 876 F.2d at 864 (citations omitted).

On December 15, 2014, Kerwin filed his Motion to Dismiss, well within the June 2, 2015 deadline to file proofs of claim. The Motion to Dismiss is plainly a writing filed with the Court that expresses Kerwin's demand to be paid, as evidenced by Kerwin's statement in his supporting brief that "[t]he debt in question is most certainly a serious one that needs to be enforced." Br. in Supp. of Mot. to Dismiss Steven Rosenblum's Bankruptcy Filing and Set Aside Automatic Stay Pursuant to 11 U.S.C. §1307(c) & 11 U.S.C. §362(d)(1) ("Supporting Br.") 2. In addition, the Motion to Dismiss specifically puts the Debtor and Court on notice as to the existence, nature and amount of Kerwin's claim, as evidenced by Kerwin's statement that he "obtained a $76,800.00 verdict against Steven Rosenblum for Trademark Infringement in the matter of Xtreme Caged Combat v. ECC Fitness on August 13, 2014." Mot. to Dismiss ¶ 2. Moreover, an entire section of Kerwin's Supporting Brief is dedicated to describing, in detail, the nature of the debt and how it arose. Supporting Br. 2.

Finally, because Kerwin is a *pro se* litigant, it is equitable to treat the Motion to Dismiss as an informal proof of claim. "A document filed *pro se* is 'to be liberally construed' . . . ." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also In re JRA 222, Inc.*, 365 B.R. 508, 513–14 (Bankr. E.D. Pa. 2007) (construing a *pro se* litigant's belated response as a timely attempt to set aside the entry of default judgment and to answer the complaint). The Court liberally construes *pro se* submissions because "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Higgs v. Att'y Gen. of the U.S.*, 655 F.3d 333, 339 (3d

Cir. 2011), *as amended*, (Sept. 19, 2011) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d

471, 475 (2d Cir. 2006)).

Accordingly, Kerwin should not be deemed to have forfeited his claim against the Debtor

simply because, as a *pro se* litigant, he did not realize that he was required to file a formal proof

of claim. He has been actively involved in this case since December 15, 2014, when he filed the

Motion to Dismiss, and he has made clear his intent to enforce the Judgment against the estate

throughout this proceeding. As a result, the Court construes the Motion to Dismiss as an

informal proof of claim filed by Kerwin in this bankruptcy case. Therefore, an avoidance action

could have been filed by the Trustee pursuant to § 544(b) under PUFTA.

### C.    Derivative Standing May Be Granted to Creditors Under Appropriate Circumstances in Chapter 13 Bankruptcies

The Third Circuit has not expressly authorized derivative standing for creditors in

Chapter 13 proceedings, but the court has suggested that it may be available under certain

circumstances. *See In re Weyandt*, 544 F. App'x 107, 110 (3d Cir. 2013) ("even assuming

derivative standing may be available in some Chapter 13 bankruptcies," the debtor failed to

prove that derivative standing was appropriate in that case).

#### 1.    Review of Third Circuit Analysis in Cybergenics II

Although this issue has not yet been resolved in the Chapter 13 context, the Third Circuit

has authorized bankruptcy courts to extend derivative standing to creditors' committees in

Chapter 11 bankruptcies in order to pursue fraudulent transfers for the benefit of the estate.

*Cybergenics II*, 330 F.3d 548, 580 (3d Cir. 2003). In *Cybergenics II*, the Third Circuit

recognized that, although § 503(b)(3)(B) empowers bankruptcy courts to *reimburse* creditors for

expenses incurred in connection with derivative suits, no provision in the Bankruptcy Code

directly authorizes derivative standing in the first place. *Id.* at 567. The court ultimately

determined that "the missing link is supplied by bankruptcy courts' equitable power to craft

flexible remedies in situations where the Code's causes of action fail to achieve their intended

purpose." *Id.*

In coming to this conclusion, the Third Circuit noted that the Supreme Court has "long

recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the

administration of bankruptcy proceedings." *Id.* Furthermore, the Third Circuit pointed out that

the enactment of the Bankruptcy Code in 1978 "did not alter bankruptcy courts' fundamental

nature" as courts of equity, as evidenced by numerous post-enactment Supreme Court decisions

as well as § 105(a) itself.[10] *Id.*

With respect to derivative standing, the court noted that it historically "arose when,

despite a lack of express statutory authorization, courts of equity allowed shareholders to pursue

valuable actions when the nominal plaintiff (the corporation) unreasonably refused to do so." *Id.*

at 568. The court also acknowledged that courts typically authorized creditors to derivatively

sue not just "faithless officers and directors" but also "third parties who had damaged or

threatened the corporate properties and whom the corporation through its managers refused to

pursue." *Id.* (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)).

Given the fundamental equitable nature of bankruptcy courts and the courts' long history

of using derivative standing, the Third Circuit concluded "that the ability to confer derivative

standing . . . is a straightforward application of bankruptcy courts' equitable powers." *Id.* It held

that, under § 544(b), Congress clearly intended a bankruptcy estate to recover fraudulently

---

[10] Section 105(a) provides that the "Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

transferred assets in order to maximize the value of the estate and vested "both the power to bring an avoidance action and the duty to bring one if it would likely benefit the estate" in the trustee. *Id.*

In *Cybergenics II*, however, the Third Circuit found that the "intended system broke down" because the debtor (which is the entity authorized to bring an avoidance action under § 544(b) in a Chapter 11 proceeding) refused to bring an avoidance action which would have benefitted the estate. *Id.* The court stated that it "is in precisely this situation that bankruptcy courts' equitable powers are most valuable, for the courts are able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Id.* Recognizing the need in § 544(b) to "channel avoidance actions through the trustee, who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors," the Third Circuit held that § 544(b) "does not foreclose a bankruptcy court's equitable power to substitute *itself* as gatekeeper when the trustee is delinquent, and to allow a creditors' committee to pursue an avoidance action *for the estate's direct benefit* rather than its own." *Id.* at 568–69 (emphasis in original).

The Third Circuit then observed "that there is a lengthy history of bankruptcy courts conferring derivative standing in analogous situations." *Id.* at 569. After reviewing cases from the Second, Sixth, and Eighth Circuits which granted derivative standing to creditors' committees, and citing Collier's long recognition of creditors' ability to obtain court permission to pursue actions on behalf of the estate, the Third Circuit stated that "we believe a presumption exists in favor of courts' power to confer derivative standing in this instance." *Id.* at 569–72. However, the court ultimately did not depend on that presumption, concluding that "the Code itself anticipates the existence of derivative standing" and that "derivative standing is a prudent

way for bankruptcy courts to remedy lapses in a trustee's execution of its fiduciary duty." *Id.* at 572. Finally, the court prescribed that, in order to exert the bankruptcy court's "equitable power to confer derivative standing upon creditors' committees to avoid fraudulent transfers," the Third Circuit must first "assess[] the public policy concerns underpinning Chapter 11." *Id.*

The court noted that § 544(b) was originally enacted to deter entities on the brink of bankruptcy from taking "extreme measures to protect the company" such as making extraordinary concessions to providers of critical services, granting liens on unencumbered property, and agreeing to excessive rates of interest which typically resulted in a reduction of assets available to the bankruptcy entity's creditors. *Id.* at 572–73. The provision thus allowed trustees to file avoidance actions, such as fraudulent transfer cases, to recover these assets for the benefit of all of the debtor's creditors. *Id.*

The Third Circuit recognized that fraudulent transfers "present a particularly vexing problem in reorganizations conducted under Chapter 11" as opposed to Chapter 7 cases, because the debtor's assets, the duty to maximize the value of the debtor's estate, and the avoidance powers, which all typically vest in trustees in a Chapter 7 case, are actually controlled *by the debtor* in a Chapter 11 case. *Id.* at 573. This situation "immediately gives rise to the proverbial problem of the fox guarding the henhouse," because it results in a conflict of interest whereby the debtor "bears a fiduciary duty to avoid fraudulent transfers that it itself made." *Id.* Moreover, "even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself." *Id.* As a result, "the real losers are the unsecured creditors whose interests avoidance actions are designed to protect." *Id.* Thus, the court concluded that, under these circumstances, "[t]he possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions." *Id.*

- 19 -

Based on these "clear benefits," the Third Circuit ultimately held that bankruptcy courts "can

authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of

the estate." *Id.* at 574, 580.

### 2.    Application of Cybergenics to Chapter 13 Proceedings

Extrapolating the analysis in *Cybergenics II* to Chapter 13 proceedings, it is clear that

Congress intended a Chapter 13 trustee to recover fraudulently transferred assets under § 544(b)

in order to maximize the value of the estate. *See id.* at 568. However, when the "intended

system" breaks down in a Chapter 13 proceeding because the Chapter 13 trustee fails to bring an

avoidance action under § 544(b), a bankruptcy court may use its equitable power to substitute

itself as gatekeeper and determine whether a party in interest may pursue an avoidance action for

the direct benefit of the estate. *Id.* at 568–69. Before exercising its discretion to use its equitable

power to substitute itself as gatekeeper, this Court recognizes that it must first satisfy itself that

the extension of derivative standing is consistent with the "form and purpose of Chapter 13

bankruptcies." *In re Weyandt*, 544 F. App'x at 110.

The primary goal of a Chapter 13 case is the completion and confirmation of a

reorganization plan which provides payments to the debtor's creditors and a discharge of the

debtor's debts. 11 U.S.C. § 1328(a). As in a Chapter 11 proceeding, the debtor in a Chapter 13

proceeding generally remains in possession of all property in the estate and has the exclusive

right and power to sell, lease, and use property of the estate. *Id.* §§ 363(b), (d)–(f), (l), 1303,

1306(b). However, unlike Chapter 11 proceedings, a Chapter 13 trustee is automatically

appointed in a Chapter 13 proceeding. *Id.* § 1302. In addition, as previously discussed, a Chapter 13 trustee has the exclusive right to file avoidance actions under § 544(b).[11]

As discussed in *Cybergenics II*, fraudulent transfers are "a particularly vexing problem" in a Chapter 11 reorganization proceeding when the debtor, acting as a gatekeeper under § 544(b), fails to avoid a fraudulent transfer which would benefit the estate because the debtor has a conflict of interest or insufficient resources to bring such action. 330 F.3d at 573. Fraudulent transfers are likewise problematic in a Chapter 13 reorganization when a Chapter 13 trustee fails to avoid a fraudulent transfer which would benefit the estate because the Chapter 13 trustee has insufficient resources to pursue such action since the debtor, not the Chapter 13 trustee, has possession of all estate property. Under these circumstances, and as in *Cybergenics II*, the "real losers" are the unsecured creditors whose interests were supposed to be protected under § 544(b). *Id.* Therefore, based upon the "clear benefits" to the estate, this Court concludes that it may use its equitable power under § 105(a) to substitute itself as a gatekeeper under § 544 when a Chapter 13 trustee fails to file a fraudulent transfer action which would directly benefit the estate and to determine whether a creditor is entitled to sue derivatively to pursue a fraudulent transfer action. *Id.* at 574.

### D. Plaintiffs Are Entitled to Derivative Standing to Pursue the State Litigation

The Debtor argues that Plaintiffs are not entitled to derivative standing because the fraudulent transfer claims will not benefit the Debtor's estate. Debtor's Derivative Standing Br. 9–10.

---

[11] One caveat to this general rule, which is not applicable here, is that, under certain limited circumstances, § 522(h) permits a debtor to use the trustee's avoidance powers to recover property that may be exempted in the debtor's bankruptcy proceeding.

- 21 -

In determining whether Plaintiffs are entitled to derivative standing, the Court begins with the proposition that granting derivative standing should be "the exception rather than the rule." *In re Weyandt*, 544 F. App'x at 110 (quoting *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d 557, 562 (4th Cir. 2005)). Derivative standing is appropriate only if: "(i) the movant has alleged a colorable claim that would benefit the estate (ii) the trustee has unjustifiably refused to pursue the claim itself; and (iii) the movant has obtained permission from the bankruptcy court to initiate the action on behalf of the estate." *In re Stewart*, 473 B.R 612, 637 (Bankr. W.D. Pa. 2012) (citing *In re Nat'l Forge Co.*, 326 B.R. 532, 543 (W.D. Pa. 2005)), *aff'd*, Civ. A. No. 12-1243, 2013 WL 4041963 (W.D. Pa. Aug. 8, 2013)). However, derivative standing may be granted even if the creditor did not seek the court's permission to initiate the action where, after examining the creditor's conduct, the Court determines that such action will benefit the estate without usurping the trustee's powers. *In re Nat'l Forge Co.*, 326 B.R. at 555.

Some courts have also held that the creditor should formally request that the trustee pursue the claim so that the trustee is aware of the claim and can explain his decision not to pursue it. However, such a request may be excused if those concerns are satisfied. *Id.* at 544. The Court will examine these issues in turn.

### 1.    The Fraudulent Transfer Claims Are Colorable

"[A] creditor's claims are colorable if they would survive a motion to dismiss." *In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008); *accord In re Optim Energy, LLC*, 527 B.R. 169, 173 (D. Del. 2015) (citing *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010)) (reciting the same standard); *In re G-I Holdings, Inc.*, Civ. No. 04-3423, 2006 WL 1751793, at *5 (D.N.J. June 21, 2006) (citing *In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004)) (reciting the same standard). Therefore, to state a colorable claim,

- 22 -

a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). Under this standard, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The Complaint first purports to state a fraudulent transfer claim under the actual intent standard, PUFTA § 5104(a)(1). Compl. ¶ 1. The actual intent standard provides that any transfer made by a debtor is fraudulent if made "with actual intent to hinder, delay or defraud any creditor of the debtor." PUFTA § 5104(a). To determine whether the transfer was made with the requisite intent, "consideration may be given" to a number of factors, including whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer; . . .

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred[.]

*Id.* § 5104(b). The fact that a transfer was made to a relative is not a badge of fraud "sufficient to warrant avoidance when unaccompanied by any other evidence of fraud." *Id.* § 5104 cmt. 5. However, such a transfer "warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged." *Id.*

Claims under PUFTA § 5104(a)(1) are subject to Federal Rule of Civil Procedure 9(b), and the Complaint therefore must "plead the circumstances constituting the alleged [actually]

- 23 -

fraudulent conveyances with particularity." [12] *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R.

375, 393 (E.D. Pa. 2013) (quoting *Bratek v. Beyond Juice, LLC*, No. Civ.A. 04-4491, 2005 WL

3071750, at *6 (E.D. Pa. Nov. 14, 2005)). Essentially, the "who, what, when, where, and how"

of the claim must be pled. *In re Covenant Partners, L.P.*, 531 B.R. 84, 89 (Bankr. E.D. Pa.

2015) (quoting *In re Dulgerian*, 388 B.R. 142, 147 (Bankr. E.D. Pa. 2008)). However, "intent

need only be alleged generally." *Image Masters, Inc.*, 489 B.R. at 395 (citing Fed. R. Civ. P.

9(b)). This heightened pleading standard serves "to place the defendants on notice of the precise

misconduct with which they are charged, and to safeguard defendants against spurious charges of

immoral and fraudulent behavior." *Id.* at 392–93 (quoting *Seville Indus. Mach. Corp. v.

Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). It also serves to allow defendants to

prepare an adequate answer to the allegations. *Id.* at 395 (citing *Denny v. Carey*, 72 F.R.D. 574,

578 (E.D. Pa. 1976)).

The Complaint in the State Litigation states a plausible claim under the actual intent

standard. First, it satisfies the requirement that intent be pled generally. *See* Compl. ¶ 11

(alleging that the Debtor stated that "he fully intended to hide all of his financial assets during

the pendency of the trademark infringement suit and that he would declare bankruptcy if

plaintiffs ever managed to get a judgment against him"). Second, it pleads at least three badges

of fraud: that the Debtor transferred the Properties (defined below) to insiders, retained control

of the Properties, and did not receive reasonably equivalent value. Those allegations, set forth

below and elsewhere in the Complaint, clearly do not comprise mere conclusory statements, nor

do they merely recite the elements of a cause of action under the actual intent standard:

---

[12] Federal Rule of Civil Procedure 9(b) is applicable in adversary proceedings by virtue of Federal Rule of Bankruptcy Procedure 7009. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

(1) Defendants are insiders of the Debtor, "[o]ne a close personal and family friend, and the other, the debtor's father." *Id.* ¶ 41.

(2) Debtor "has continued to retain possession over these businesses and property" despite the transfers. *Id.* ¶ 42. Specifically, the Complaint avers that the Debtor claims each business location on his tax returns without listing the Defendants as partners and retains all of the profits from each location. *Id.* ¶¶ 23–24, 32–33. Further, it avers that the Defendants do not claim either location on their tax returns and retain none of the profits therefrom. *Id.* ¶¶ 24, 26, 33, 35.

(3) Defendants gave "absolutely nothing in exchange" for the transfers. *Id.* ¶ 40. Specifically, the Complaint avers that the Debtor "claims . . . that he received nothing in exchange" for the Torresdale Gym and admitted "that Allan Rosenbaum [sic] put absolutely no money toward the purchase" of the Levittown Gym. *Id.* ¶¶ 20, 30.

Accepting these factual allegations as true, the Complaint contains sufficient matter to state a plausible claim against the Debtor under the actual intent standard. *See* PUFTA § 5104 cmt. 5 (stating that "a transfer to a closely related person," such as the Defendants here, "warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged"). In light of the pending Trademark Litigation against the Debtor at the time of the alleged transfers, the Court can reasonably infer from the allegations of the Complaint that Plaintiffs have set forth colorable claims under PUFTA § 5104(a)(1).

The Complaint also provides sufficiently particular details regarding the fraud to satisfy the heightened pleading standard of Rule 9(b). The allegations describe in detail the Properties and the consideration exchanged, the identities of the transferees, and implicate at least the three badges of fraud listed above. Such allegations sufficiently notify Defendants of the "who, what, when, where, and how" of the misconduct with which they are charged to prepare an adequate response. *Cf. Image Masters, Inc.*, 489 B.R. at 393–95 (concluding that a trustee's complaint satisfied Rule 9(b) because it "alleged in detail the nature and scope" of the fraudulent scheme "as well as the dates and amounts of each transfer she sought to avoid"); *River Rd. Dev. Corp. v. Carlson Corp.—Ne.*, CIV. A. No. 89-7037, 1990 WL 69085, at *10 (E.D. Pa. May 23, 1990)

(concluding that the plaintiff's complaint satisfied Rule 9(b) because it identified not just the "plan and scheme" of the fraud, but also the "conveyances in question," even if it did not "identify [the] specific dates and amounts of these conveyances . . . because this information is peculiarly within the knowledge of [the] defendants"). The Complaint thus states a colorable claim under the actual intent standard because it satisfies the plausibility and the heightened fraud pleading standards.

The Complaint also states colorable claims for constructive fraud. Sections 5104(a)(2) and 5105 of PUFTA set forth distinct causes of action for constructive fraud. *In re Fid. Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 715 (E.D. Pa. 2007). Unlike the actual intent standard, claims of constructive fraud are not subject to the heightened pleading standard of Rule 9(b) because "fraud does not have to be proven." *United States v. Rocky Mountain Holdings, Inc.*, Civ. A. No. 08-3381, 2009 WL 564437, at *9 (E.D. Pa. Mar. 4, 2009) (citing *Bratek*, 2005 WL 3071750, at *6); *see also In re Transcon. Refrigerated Lines, Inc.*, 438 B.R. 520, 522 (Bankr. M.D. Pa. 2010) (observing that "most Courts in the Circuit recognize that constructive fraudulent transfer claims are not analyzed under the heightened Rule 9(b) pleading standard" and accordingly declining to apply the standard).

To state a claim for constructive fraud under either provision, it is necessary to show that the debtor did not receive reasonably equivalent value in exchange for a transfer of the Debtor's property. PUFTA §§ 5104(a)(2), 5105. Section 5104(a)(2) also requires that the debtor "intended to incur, or believed or reasonably should have believed that [he] would incur, debts beyond [his] ability to pay as they became due." *Id.* § 5104(a)(2)(ii). In contrast, § 5105 requires that the debtor either "was insolvent at [the] time" of the transfer or "became insolvent as a result of the transfer." *Id.* § 5105. The burden to prove the elements of constructive fraud

under §§ 5104(a)(2) and 5105 is on the party challenging the transfer. *In re C.F. Foods, L.P.*, 280 B.R. 103, 115 (Bankr. E.D. Pa. 2002).

Whether the Debtor received reasonably equivalent value is determined as follows:

> The procedure for evaluating reasonably equivalent value in this circuit requires two steps. First, the court must determine whether the debtor received "any value at all" from the challenged transaction. "Value" is defined by the Bankruptcy Code as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Second, if the court finds that a debtor received at least some value, it must then decide whether the value received was "roughly the value it gave." In assessing whether reasonably equivalent value was received, the court should look to the "totality of the circumstances," including (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's-length relationship between the debtor and transferee" and (3) the transferee's good faith. The court may consider in its evaluation both direct and indirect benefits conferred by the transfer. Further, because the purpose of fraudulent conveyance laws is estate preservation, "the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors."

*Image Masters, Inc.*, 489 B.R. at 387 (citations omitted). Here, the analysis stops at the first step because Plaintiffs have alleged that the Debtor received absolutely nothing of value in exchange for the transfers. Compl. ¶¶ 20, 30, 40. The Complaint therefore sufficiently pleads the first element of constructive fraud under both §§ 5104(a)(2) and 5105.

In order to determine whether § 5104(a)(2)(ii) has been satisfied, courts focus on the debtor's "subjective intent." *In re C.F. Foods, L.P.*, 280 B.R. 103, 116–17 (Bankr. E.D. Pa. 2002) (citing *In re Taubman*, 160 B.R. 964, 987 (Bankr. S.D. Ohio 1993)). As stated above, the debtor must have "intended to incur, or believed or reasonably should have believed that [he] would incur, debts beyond [his] ability to pay as they became due." PUFTA § 5104(a)(2)(ii). Therefore, the question is not whether the Debtor *actually* was not timely paying his debts. *Id.* § 5104 cmt. 4. Instead, the inquiry looks to the Debtor's "ability" to pay his debts and his "intentions and beliefs with respect to such ability . . . on a continuing basis now and in the future." *Id.*; *see also Rocky Mountain Holdings, Inc.*, 2009 WL 564437, at *10 (denying a

motion to dismiss constructive fraud claims in part because the defendant "could have reasonably anticipated a tax liability . . . that exceeded the amount of money it retained after . . . the challenged transfers" and that arose five months after the transfers).

The Complaint satisfies § 5104(a)(2)(ii) because it alleges that the Debtor reasonably anticipated that his obligation to Plaintiffs would exceed his remaining assets after he transferred the Properties to Zarro and Rosenblum. As discussed below, the Complaint essentially outlines a scheme whereby the Debtor liquidated some of his assets, after he was sued by Kerwin, in order to purchase a gym and then transferred: (1) a 50% ownership interest in such gym to his father and (2) a 100% ownership interest in another gym to a close friend, in both instances without receiving anything in exchange for such transfers.

Specifically, the Complaint alleges that, one month after the Trademark Plaintiffs filed the Trademark Litigation against the Debtor, the Debtor used proceeds from a home equity loan on a home that he owned to purchase a gym located at 8919 New Falls Road, Levittown, PA 19056 ("Levittown Gym"), for $50,000. Compl. ¶¶ 8, 30. The new gym was operated under the name of Quick Fit USA, LLC. *Id.* ¶ 9. The Debtor allegedly began to "funnel all financial transactions from another gym he owned called ECC Fitness located at 8801 Torresdale Avenue in Philadelphia, Pennsylvania into the Quick Fit USA, LLC account." *Id.* ¶ 10.

The Complaint then alleges that the Debtor transferred the Levittown Gym and the gym at the Torresdale location ("Torresdale Gym" and collectively with the Levittown Gym, the "Properties") to the Defendants without receiving anything of value in exchange. *Id.* ¶¶ 19–20, 29–30, 40. The Complaint avers that the Debtor transferred 100% of his ownership interest in the Torresdale Gym and all of its contents to Zarro, and 50% of his ownership interest in the Levittown Gym and all of its contents to Rosenblum. *Id.* ¶¶ 19, 29, 37.

It is also alleged that neither Zarro nor Rosenblum currently claim the Properties on their

tax returns, receive any of the operating revenue from the Properties, or contribute to the

Properties' operating costs. *Id.* ¶¶ 24, 26, 33, 35.[13] Instead, the Debtor allegedly claims 100% of

the Properties on his tax return, does not list either of the Defendants as partners, and receives all

of the operating revenue from the Properties. *Id.* ¶¶ 23–24, 32–33.

The Complaint further alleges that the Debtor "purchased [the Levittown] gym with the

intent [to] put the financial assets he used to purchase the gym and any income derived therefrom

out of plaintiffs['] reach in anticipation of a future judgment" related to the Trademark

Litigation. *Id.* ¶ 9. In addition, the Debtor allegedly "verbally informed Ofa Donaldson and

other former employees of ECC Fitness that he fully intended to hide all of his financial assets

during the pendency of the trademark infringement suit and that he would declare bankruptcy if

plaintiffs ever managed to get a judgment against him." *Id.* ¶ 11.

Accepting the foregoing nonconclusory allegations as true and making all reasonable

inferences therefrom in favor of Plaintiffs, the Complaint plausibly alleges that the Debtor

reasonably anticipated that he was going to incur a debt to Plaintiffs that would exceed the assets

the Debtor had on hand after transferring his Properties. In particular, the Debtor was well aware

of the probability that the Trademark Litigation would produce a judgment against him at the

time that he transferred the Properties and, taking all of the allegations regarding his statements

and intent about shielding his assets to avoid paying such obligation as true, it is clear that he

knew that he would not have sufficient assets to pay the Judgment after he transferred the

Properties to Zarro and Rosenblum. Therefore, the Complaint sufficiently alleges facts that

---

[13] There is no paragraph numbered 32 in the Complaint; instead, there are two paragraphs numbered 33. References to paragraph 32 of the Complaint in this opinion are to the first paragraph numbered 33, and references to paragraph 33 of the Complaint are to the second paragraph numbered 33.

would satisfy § 5104(a)(2)(ii). *Cf. In re C.F. Foods, L.P.*, 280 B.R. at 117 (concluding that the debtor satisfied § 5104(a)(2)(ii) because "he must have realized that the Ponzi scheme would eventually fail, so that, ultimately, many debts could not and would not be paid").

Unlike § 5104(a)(2)(ii), insolvency under § 5105, or "balance sheet" insolvency, requires that a debtor *is actually insolvent* at the time of the transfers or *becomes insolvent* immediately thereafter. PUFTA §§ 5102 cmt. 1, 5105. For the purpose of balance sheet insolvency, "[a] debtor is insolvent if, at fair valuations, the sum of [his] debts is greater than all of [his] assets." *Id.* § 5102(a). Because PUFTA neither defines "fair valuation" nor specifies a corresponding method of valuation, "different methods of determining value on any particular basis may be appropriate" in different circumstances. *Id.* § 5102 cmt. 1.

"Asset[s]" are defined as the "[p]roperty of a debtor." *Id.* § 5101(b). However, there are four categories of property that are not considered assets under PUFTA. The first three excluded categories are property to the extent it is (1) "encumbered by a valid lien," (2) "generally exempt under nonbankruptcy law," or (3) "held in tenancy by the entireties . . . [and] not subject to process by a creditor holding a claim against only one tenant." *Id.* The final category excludes "property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer fraudulent under [PUFTA]." *Id.* § 5102(d).

A "[d]ebt" is defined as a "[l]iability on a claim." *Id.* § 5101(b). In turn, "[t]he definition of 'claim' is derived from § 101(5) of the Bankruptcy Code." *Id.* § 5101 cmt. 3. Accordingly, a claim is "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.* § 5101(b) (emphasis added). However, contingent liabilities "should

- 30 -

be discounted by factors representing the probability that such contingent liabilities . . . will ever be realized" and by the time value of money. *Id.* § 5102 cmt. 1.

Because contingent liabilities qualify as debts, the "awareness of a probable legal action against a debtor amounts to a debt for purposes of determining solvency." *United States v. Green*, 201 F.3d 251, 257 (3d Cir. 2000) (citing *Baker v. Geist*, 321 A.2d 634, 636 (Pa. 1974)). Therefore, if a debtor owes a legal liability to a person at the time of a transfer, then that person is a creditor of the debtor at the time of the transfer even if a corresponding judgment is not yet entered. *Baker*, 321 A.2d at 636.

Finally, debts "do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." PUFTA § 5102(e). This exclusion corresponds to the exclusion of assets to the extent that they are "encumbered by a valid lien." *Id.* § 5101(b); *see also id.* § 5102 cmt. 5 (stating that this exclusion's purpose is to not "render a person insolvent under this section by counting as a debt an obligation secured by property of the debtor that is not counted as an asset"). The effect of these corresponding provisions equally reduces a debtor's aggregate assets and liabilities where a creditor holds a valid lien against the debtor's property. *See id.* § 5102 cmt. 1 (stating that where a debtor's property is encumbered by a lien, "both the encumbered interest and the debt secured thereby are excluded from the computation of insolvency under [PUFTA]"). As a result, "the words 'claim' and 'debt' as used in [PUFTA] generally have reference to an unsecured claim and debt. As the context may indicate, however, usage of the terms is not so restricted." *Id.* § 5101 cmt. 3. This evinces the Act's purpose, which "is primarily to protect unsecured creditors against transfers and obligations injurious to their rights." *Id.*

In the absence of "specific financial information," the Court may "reasonably infer" insolvency from other facts. *See In re Covenant Partners, L.P.*, 531 B.R. 84, 93 (Bankr. E.D. Pa. 2015) (stating that various oral and written communications concerning a debtor's financial condition "suffice for alleging insolvency"). Here, as explained above, the Complaint alleges facts that give rise to a plausible inference that the Debtor became insolvent after the transfers in order to shield his Properties. *See* Compl. ¶¶ 9, 11 (alleging that the Debtor intended to "put the financial assets he used to purchase the gym and any income derived therefrom out of plaintiffs['] reach in anticipation of a future judgment that would be obtained against him" and that he admitted to his former employees "that he fully intended to hide all of his financial assets . . . and that he would declare bankruptcy if plaintiffs ever managed to get a judgment against him").

It accordingly can be plausibly inferred that the Debtor transferred the Properties to place them beyond the reach of Plaintiffs and was aware that the transfers would render him insolvent. There is no question that the obligation to Plaintiffs was a contingent liability of the Debtor when the transfers occurred, and therefore constitutes a debt for the purpose of determining whether the Debtor was insolvent. *Green*, 201 F.3d at 257 (citing *Baker*, 321 A.2d at 636); *see also In re Covenant Partners, L.P.*, 531 B.R. at 93 (inferring that a debtor was insolvent at the time of, or became insolvent as a result of, certain transfers in part because of facts "[t]hat suggest[ed] that the Debtor had insufficient assets to satisfy [a] judgment"). Additionally, the fact that the Debtor filed for bankruptcy protection shortly after Kerwin began collection efforts to enforce the Judgment against the Debtor's property further supports the conclusion that the transfers rendered the Debtor insolvent. *See* Compl. ¶¶ 13–17 (stating that the Debtor refused to comply with Kerwin's discovery requests related to collection of the Judgment and filed for bankruptcy

- 32 -

immediately before a contempt hearing was scheduled in connection with Debtor's failure to respond to such discovery).

In sum, the Complaint sufficiently alleges that the Debtor (1) exchanged the Properties without receiving reasonably equivalent value in return; (2) reasonably believed that he would incur debts beyond his ability to pay as they became due; and (3) became insolvent as a result of the transfers. The Complaint therefore states colorable claims for constructive fraud under PUFTA §§ 5104(a)(2) and 5105.

Furthermore, it is clear that pursuit of the actual and constructive fraudulent transfer claims will benefit the estate. The estate will not bear any of the legal costs to pursue the State Litigation, and Kerwin has agreed that any property or proceeds received in connection with the State Litigation will be transferred to the Trustee for distribution to all of the Debtor's creditors under the Plan. Hearing Tr. 16:12–24, Sept. 15, 2015. Based upon the foregoing, Plaintiffs have satisfied the first part of the derivative standing analysis.

    2.    The Second Requirement Is Satisfied When the Trustee Declines to Pursue an Avoidance Action Due to a Lack of Financial Resources and Such Avoidance Action Would Benefit the Estate

The next part of the derivative standing analysis requires this Court to determine whether the Trustee unjustifiably declined to pursue the PUFTA Claims. *In re Nat'l Forge Co.*, 326 B.R. 532, 543 (W.D. Pa. 2005); *In re Stewart*, 473 B.R. 612, 637 (Bankr. W.D. Pa. 2012), *aff'd*, Civ. A. No. 12-1243, 2013 WL 4041963 (W.D. Pa. Aug. 8, 2013). Although courts in the Third Circuit have not addressed this part of the derivative standing test, the Second and Sixth Circuits have.[14] In *In re Commodore International, Ltd.*, 262 F.3d 96 (2d Cir. 2001), the Second Circuit

---

[14] In *Cybergenics II*, the Third Circuit specifically cited to Second Circuit and Sixth Circuit decisions as evidence "that there is a lengthy history of bankruptcy courts conferring derivative standing in analogous situations." 330 F.3d at 548, 569–71.

held that a creditors' committee may bring suit even if a debtor-in-possession has not

unjustifiably refused to do so, provided that:

> (1) the committee has the consent of the debtor in possession or trustee, and (2) the
> court finds that suit by the committee is (a) in the best interest of the bankruptcy
> estate, and (b) is "necessary and beneficial" to the fair and efficient resolution of
> the bankruptcy proceeding.

262 F.3d at 100 (citing *In re Spaulding Composites Co.*, 207 B.R. 899, 904 (B.A.P. 9th Cir.

1997)). And in *In re Gibson Group*, 66 F.3d 1436 (6th Cir. 1995), the Sixth Circuit held that

> a bankruptcy court does not err if it finds that a facially justifiable reason for failing
> to file an avoidance action, such as where a trustee claims that a lack of funds is its
> only reason for failing to bring the action, is actually insufficient to justify the
> failure to bring the action if under the circumstances the claim will benefit the estate
> even after attorneys' fees and costs are deducted.

66 F.3d at 1442–43.

The Court finds that, under either test, Plaintiffs have satisfied this prong of the derivative

standing test. Under the Second Circuit test, Plaintiffs have obtained the consent of the Trustee

and this Court has already found, *supra*, that the State Litigation is in the best interest of the

Debtor's estate. Chapter 13 Standing Trustee's Statement Indicating No Opp'n to the Allowance

of Derivative Standing ("Trustee's Statement") 1. With regard to whether granting derivative

standing is necessary and beneficial to the fair and efficient resolution of this proceeding, it is

clear that the State Litigation may bring funds into the Debtor's estate for the benefit of

unsecured creditors and, in the absence of Plaintiffs' pursuit of the State Litigation, the Trustee

would be unable to independently pursue the State Litigation because he has no assets on hand to

do so. 11 U.S.C. § 1306(b). Therefore, granting derivative standing to Plaintiffs is necessary

and beneficial to the fair and efficient resolution of the Debtor's bankruptcy proceeding because

it will maximize the value of the Debtor's estate for the benefit of all creditors.

With respect to the Sixth Circuit test, the Trustee failed to bring an avoidance action in connection with the PUFTA Claims for two reasons: the lack of funds available to pursue such claims, and the Trustee's belief that the Debtor's Plan was overfunded due to Kerwin's failure to timely file a proof of claim. Trustee's Statement 1. As discussed *supra*, the Court has now determined that Kerwin's prior filings in this case constitute an informal proof of claim, and therefore that the Plan is not overfunded, and that pursuit of the State Litigation would benefit the estate. Accordingly, the Trustee's facially justifiable reasons for failing to file an avoidance action to pursue the PUFTA Claims are insufficient.

For all of these reasons, the Court finds that Plaintiffs have satisfied this part of the derivative standing test.

### 3.    Plaintiffs' Failure to Seek Prior Court Approval Is Not Fatal

The requirement that a creditor seek the bankruptcy court's approval prior to filing a derivative claim flows from the bankruptcy court's role as a "gatekeeper" with respect to derivative standing actions. *In re Nat'l Forge Co.*, 326 B.R. 532, 554 (W.D. Pa. 2005). However, as articulated in *In re National Forge Co.*, this is not a *per se* rule, and standing may be granted retroactively after considering "the underlying policy objectives." *Id.* at 546. Although other courts within the Third Circuit have not considered this issue, the analysis set forth in *In re National Forge Co.* conforms to widely accepted practices. *See, e.g., In re Racing Servs., Inc.*, 540 F.3d 892, 904 (8th Cir. 2008) (following *In re National Forge Co.* and "numerous federal courts granting creditors retroactive permission"). *But see In re Balt. Emergency Servs. II, Corp.*, 432 F.3d 557, 563 (4th Cir. 2005) (rejecting retroactive derivative standing).

In *In re National Forge Co.*, the court outlined the policies underlying the reasons for prior court approval and found that a court should only grant derivative standing retroactively if,

- 35 -

after examining the creditor's conduct, it will benefit the estate without usurping the trustee's powers. 326 B.R. at 555. The court identified eight factors that a court might consider in its analysis:

> (i) whether the court would have granted derivative standing prospectively in the first instance if court approval had been sought prior to the filing of the lawsuit;
>
> (ii) whether retroactive approval of the claims would perpetuate confusion, undermine the Debtor's efforts to reorganize, or otherwise compromise the orderly and efficient administration of the estate;
>
> (iii) whether the plaintiff was under time pressure to commence suit before leave of court could formally be obtained;
>
> (iv) the length of time that the plaintiff delayed in seeking court approval for the action;
>
> (v) the extent to which retroactive approval would unfairly prejudice other parties;
>
> (vi) whether the delay in seeking court approval was caused by something more than mere neglect or oversight on the part of the plaintiff;
>
> (vii) whether, under the totality of circumstances, retroactive approval of the lawsuit would likely encourage laxity on the part of creditors or their counsel or a disregard for the general requirement of prior court authorization; and
>
> (viii) whether overriding principles of fairness require an examination of the plaintiff's claims notwithstanding the plaintiff's failure to obtain prior leave of court before commencing the lawsuit.

*Id.* at 556. While these factors are "relevant," they are not "exhaustive," nor will each factor apply in every case. *Id.* at 556 n.11.

In the instant matter, the first and fourth factors clearly support retroactive approval. First, as discussed *supra*, the Court would have prospectively granted derivative standing. Furthermore, Kerwin immediately disclosed to the Court that Plaintiffs had filed the State Litigation and promptly complied with this Court's request that Plaintiffs address whether they should be granted derivative standing to pursue the State Litigation.

In addition, given the fact that Kerwin is *pro se* and did not realize that he needed derivative standing to pursue the State Litigation, but, at the same time, zealously pursued his interests in the bankruptcy case, it is not likely that retroactive approval will encourage laxity or disregard of the general requirement of prior court authorization. *See id.* at 558 (granting retroactive approval where the responsible party was not "simply sitting on its hands," but "diligently" investigating and protecting its interests). Therefore, the seventh factor also supports retroactive approval.

Finally, overriding principles of fairness weigh in favor of granting Plaintiffs derivative standing to pursue the State Litigation despite any prejudice that might result. Based upon the record before the Court, the Court finds that Plaintiffs acted in good faith to collect on the Judgment that they obtained in the District Court. The Debtor, on the other hand, defied the District Court's order compelling him to produce discovery related to the identification and location of the Debtor's available assets. Then, on the eve of the contempt hearing related to the Debtor's failure to provide discovery, the Debtor filed for bankruptcy. Given the detailed facts alleged by Plaintiffs in the Complaint regarding the Debtor's alleged fraudulent transfers, it would be unfair to deny Plaintiffs the opportunity to fund and pursue the State Litigation which, if successful, will benefit the Debtor's bankruptcy estate. Indeed, "the overall 'fairness' concept of bankruptcy laws mandates that the debtor's transactions should not pass without examination." *Id.* (quoting *In re S. Rachles, Inc.*, 131 B.R. 782, 786 (Bankr. D.N.J. 1991)).

Based on the foregoing, retroactive approval is appropriate in the instant matter.

### 4.    Kerwin's Failure to Petition the Trustee Is Not Fatal

In addition to the three foregoing requirements in the derivative standing analysis, some courts also require a creditor to formally request that the Trustee pursue the fraudulent transfer claim unless failure to do so is excusable. *E.g., id.* at 544. A creditor is typically required to

make such a request in order to alert the trustee of the creditor's intent to assert the claims and to allow the trustee an opportunity to explain why he will not pursue them. *Id.* "In this way, courts can more effectively oversee adversary proceedings and thereby promote 'the fair and orderly administration of the bankruptcy estate.'" *Id.* (quoting *In re Catwil Corp.*, 175 B.R. 362, 364 (Bankr. E.D. Cal. 1994)).

However, if these concerns are satisfied, the Court may excuse a creditor's failure to formally request that the trustee file suit. *E.g., id.* at 546. For example, a formal request will not be required if the relevant parties were aware of the creditor's intent to file an avoidance action and a request would have been futile. *E.g., id.* at 544–45. In *In re National Forge Co.*, the debtor "was well aware" that the creditors' committee was "investigating the [debtor's] 1999 stock redemption with an eye toward possibly filing an avoidance action." *Id.* at 544. The debtor also "at all times fervently opposed the action and had ample opportunity to articulate to the Bankruptcy Court its disagreement with the Committee's theory and its reasons for opposing the litigation." *Id.* Therefore, the debtor "was in no way prejudiced" by the absence of a formal request. *Id.* at 544–45.

Here, Kerwin filed the Motion to Dismiss at the outset of the case and specifically alleged that the Debtor fraudulently transferred his assets prior to filing this bankruptcy case. Mot. to Dismiss ¶ 1. In addition, Plaintiffs also filed a Statement of Facts ("SOF") in March 2015 which reiterated that the Debtor had fraudulently transferred assets prior to filing this case. In particular, the SOF alleges that the Debtor fraudulently claims that the Defendants own the Properties. SOF ¶¶ 9, 21. Thus, the Trustee was well aware that Plaintiffs believed that the Debtor had fraudulently transferred assets.

Furthermore, it would have been futile for Plaintiffs to request that the Trustee pursue the PUFTA Claims because, as discussed *supra*, the Trustee had no funds to pursue an avoidance action and the Trustee believed that the Plan was overfunded. Finally, the Court notes that the Trustee now consents to Plaintiffs' request for derivative standing to pursue the State Litigation. Trustee's Statement 1.

In sum, Plaintiffs have satisfied each part of the Court's derivative standing analysis with respect to the State Litigation. Accordingly, the Court will grant derivative standing to Plaintiffs to proceed with the State Litigation in the Bucks County Court of Common Pleas pursuant to § 544(b) provided that Plaintiffs amend the Complaint to clarify that they have been granted derivative standing under § 544(b) to avoid the PUFTA Claims on behalf of the Debtor's estate.[15]

### E.    It Is Appropriate to Hold the Bankruptcy Proceedings in Abeyance Until the State Litigation Is Resolved

Plaintiffs also request that the Court hold this bankruptcy proceeding in abeyance pending the conclusion of the State Litigation. Although Plaintiffs raise numerous arguments in support of the Abeyance Motion, one carries the day.

"In the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues." *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937)). It is not necessary that the "claims in the two proceedings are identical." *Chartener v. Provident Mut. Life Ins. Co.*, No. Civ.A. 02-8045, 2003 WL 22518526, at *3 (E.D. Pa. Oct. 22, 2003) (citing *Landis v. N. Am. Co.*,

---

[15] In addition, given that Kerwin is acting *pro se* in the State Litigation, the Court will require XCC's counsel to enter his appearance in the State Litigation on behalf of the Debtor's estate.

299 U.S. 248, 254 (1936)). The power to stay proceedings "is incidental to the power inherent in

every court to control the disposition of the cases on its docket with economy of time and effort

for itself, counsel, and for litigants." *Id.* at *1 (quoting *Landis*, 299 U.S. at 254).

Plaintiffs argue that the Court should stay the bankruptcy proceedings until the State

Litigation is resolved because, if the transfers in question ultimately are found to be fraudulent,

then the Debtor's bankruptcy case must be dismissed, the automatic stay lifted, and the

trademark infringement judgment ruled nondischargeable. Creditors' Abeyance Br. 5.

To the extent that the State Litigation ultimately results in a determination that the Debtor

fraudulently transferred assets, that determination alone would not necessarily constitute the

dispositive factor that Plaintiffs suggest, but it clearly would not be without effect. "A

bankruptcy filing made in bad faith may be dismissed 'for cause' under 11 U.S.C. § 1307(c) . . .

." *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007). Likewise, "whether the filing was in bad faith

is relevant to whether the bankruptcy court should annul the automatic stay" under § 362(d) of

the Code. *Id.* at 128. In such bad faith analyses, courts consider the "nature of the debt," "how

the debt arose," and the debtor's "intention to avoid a large single debt." *Id.* at 126 (first quoting

*In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996); then quoting *In re Tamecki*, 229 F.3d 205, 207 (3d

Cir. 2000)) (affirming a bad faith determination based in part on the state court's "adverse

judgment of fraudulent conveyance"). These "factors are also relevant to dischargeability." *Id.*

Therefore, if the transfers in question ultimately are determined to have been fraudulent, such

determination will affect this Court's resolution of the Motion to Dismiss as well as the

nondischargeability action.

Likewise, if the transfers are determined to be fraudulent, then the Plan would be less

likely to be confirmed. To be confirmed, a Chapter 13 plan must be "proposed in good faith."

- 40 -

11 U.S.C. § 1325(a)(3); *see also id.* § 1325(a)(7) (conditioning confirmation also on whether the debtor filed the bankruptcy petition in good faith).  The concealment of assets from creditors through "dubious transfers" is an "aggravating factor" in the good faith analysis.  *In re Jensen*, 369 B.R. 210, 235 (Bankr. E.D. Pa. 2007); *see also In re Dickson*, 427 B.R. 399, 406 (B.A.P. 6th Cir. 2010) (stating that a debtor risks "acting in bad faith if an obviously avoidable lien or transfer exists and the debtor does not propose a plan that contemplates avoidance of the same").

Thus, because the outcome of the State Litigation will certainly impact this Court's determination of the Motion to Dismiss, the anticipated adversary complaint to determine the dischargeability of Plaintiffs' Judgment, and the Plan confirmation, it is appropriate to hold the Debtor's bankruptcy proceeding in abeyance pending the conclusion of the State Litigation.  It is also necessary to hold these proceedings in abeyance to maximize the "economy of time and effort for [the Court], counsel, and for litigants." *Chartener*, 2003 WL 22518526, at *1 (quoting *Landis*, 299 U.S. at 254).  Indeed, if the Court declines to stay the Debtor's bankruptcy proceedings, the parties would be forced to address the fraudulent transfer issue in both forums, a colossal waste of resources which would risk the courts reaching conflicting determinations.

In light of the foregoing, the Court will hold the Debtor's bankruptcy proceeding in abeyance pending the conclusion of the State Litigation.

IV.    **CONCLUSION**

The Court will grant derivative standing to Plaintiffs to proceed with the State Litigation

in the Bucks County Court of Common Pleas on behalf of the Debtor's estate pursuant to

§ 544(b) and will grant the Abeyance Motion. An appropriate order follows.

**Date:** February 29, 2016

_____
Ashely M. Chan
**United States Bankruptcy Judge**